**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

DONNELLY COMMODITIES
INCORPORATED, on behalf of
itself and all others similarly situated,
12 Manor Road.
Smithtown, NY 11787

      v.

ASSOCIATION OF
AMERICAN RAILROADS
50 F Street, NW
Washington, DC 20001;

UNION PACIFIC RAILROAD
COMPANY
1400 Douglas Street
Omaha, Nebraska 68179;

BNSF RAILWAY COMPANY
2650 Lou Menk Drive
Fort Worth, Texas 76131;

CSX TRANSPORTATION, INC.;
500 Water Street
Jacksonville, Florida 32202;

NORFOLK SOUTHERN
RAILWAY COMPANY
Three Commercial Place
Norfolk, Virginia 23410;

and,

KANSAS CITY
SOUTHERN RAILWAY COMPANY;
426 West 12th Street
Kansas City, Missouri 64105

      Defendants.

**CLASS ACTION COMPLAINT**
**FOR DAMAGES**

**DEMAND FOR JURY TRIAL**

Case: 1:07-cv-01515
Assigned To : Friedman, Paul L.
Assign. Date : 8/24/2007
Description: Antitrust

JURY ACTION

1

**CLASS ACTION COMPLAINT; DEMAND FOR JURY TRIAL**

## I.    INTRODUCTION

1.    Plaintiff Donnelly Commodities Incorporated brings this action on behalf of itself individually and on behalf of a plaintiff class (the "Class") who purchased unregulated rail freight transportation services from Defendants between approximately July 1, 2003 and the present (the "Class Period").

2.    This is an antitrust class action alleging that Defendants conspired to fix, raise, maintain, or stabilize prices of unregulated rail freight transportation services sold in the United States by imposing agreed-upon Rail Fuel Surcharges on rail freight shipments from July 1, 2003 to the present (the "Class Period"), in violation of Section 1 of the Sherman Antitrust Act.

## II.    JURISDICTION AND VENUE

3.    Plaintiff brings this action pursuant to Sections 4 and 16 of the Clayton Act (14 U.S.C. §§ 15 and 26) for treble damages and injunctive relief, as well as reasonable attorneys' fees and costs with respect to injuries sustained by plaintiff as a result of Defendants' violations of Section 1 of the Sherman Act (U.S.C. § 1).

4.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1337 and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26).

5.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (c) in that at least one of the Defendants resides in this judicial district, is licensed to do business or is doing business in this judicial district.

## III.    PARTIES

### A.    Plaintiff

6.    Plaintiff Donnelly Commodities Incorporated ("Donnelly") is a New York corporation with its principal place of business in Smithtown, New York.  Donnelly is a freight consolidator who purchased unregulated rail freight transportation services directly from one or more of the Defendants during the Class Period and paid Rail Fuel Surcharges thereon.

## B.    Defendants

7.    Defendant Association of American Railroads ("AAR") is a trade association located in Washington, DC. The AAR publishes key indices used to compute unregulated rail freight charges, engages in lobbying on behalf of its members, gathers and maintains a variety of information relating to rail freight service, and issues publications. The AAR is governed by a Board of Directors that includes the top executives from each of the Defendant railroads, and each Defendant railroad is a Full Member of the AAR.

8.    Defendant Union Pacific Railroad Company ("UP") has its principal place of business at 1400 Douglas Street, Omaha, Nebraska 68179. UP is the largest freight railroad in the United States. UP serves primarily the western two-thirds of the United States and maintains coordinated schedules with other rail carriers to handle freight to and from other parts of the country. UP maintains an office at 600 13th Street, N.W., #340, Washington, DC 20005.

9.    Defendant BNSF Railway Company ("BNSF") has its principal place of business at 2650 Lou Menk Drive, Fort Worth, Texas 76131. BNSF is a wholly owned subsidiary off the Burlington Northern Santa Fe Corporation, the holding company formed by the September 22, 1995 merger of Burlington Northern and Santa Fe Corporation. BNSF is the second largest railroad network in North America and operates 32,000 route miles of railroad. BNSF has offices and rail lines throughout the western United States, extending into the Southeastern states, and maintains a government affairs office at 500 New Jersey Avenue, NW, Suite 550, Washington, DC 20001.

10.    Defendant CSX Transportation, Inc. ("CSX") has its principal place of business at 500 Water Street, Jacksonville, Florida 32202. CSX is a major freight railroad operating primarily in the eastern United States and Canada. CSX links commercial markets in 23 states, the District of Columbia, and certain Canadian provinces. CSX has railway lines throughout the eastern United States and maintains a government relations office at 1331 Pennsylvania Avenue, NW, Suite 560, Washington, DC 20004.

11. Defendant Norfolk Southern Railway Company ("NS") has its principal place of business at Three Commercial Place, Norfolk, Virginia 23410. NS is a major freight railroad operating primarily in the eastern United States. NS serves all major eastern ports and connects with rail partners in the West, linking customers to markets around the world. NS operates an intermodal terminal at 100 South Vandom Street, Washington, DC 20001, and maintains a government relations office at 1500 K Street, NW #375, Washington, DC 20005.

12. Defendant Kansas City Southern Railway Company ("KCSR") has its principal place of business at 426 West 12th Street, Kansas City, Missouri 64105. KCSR owns and operates major freight railroad in ten states across the central and south central United States, including the shortest route between Kansas City (the second largest rail hub in the country) and the Gulf off Mexico.

13. "Defendants" refers to all six named Defendants in this action, while "Railroad Defendants" refers to only BNSF, CSX, Kansas City Southern, Norfolk Southern, and Union Pacific.

## IV.    FACTUAL ALLEGATIONS

### A.    The Freight Railroad Industry

14. Freight railroads move 42 percent of the freight in this country and are vital to the economy. There are hundreds of common carrier freight railroads operating in the United States. These railroads are classified into different groups based on revenue. The railroads with the largest operating revenue are considered "Class I Railroads." Although Class I Railroads comprise only 1 percent of the number of U.S. freight railroads, they account for 70 percent of the industry's mileage operated.

15. There are currently seven Class I Railroads operating in the United States: (1) BNSF Railway Company; (2) CSX Transportation, Inc.; (3) Grand Trunk Corporation; (4) Kansas City Southern Railway Company; (5) Norfolk Southern Railway Company; (6) Soo Line Railroad Company; and (7) Union Pacific Railroad Company. The Soo Line Railroad

is owned by Canadian Pacific Railway. The Grand Trunk Corporation is owned by the Canadian National Railway.

16.     Freight rail rates are not cost based. Instead, railroads price their services based on the differing demand for rail transportation of different shippers. "Unregulated freight" means rail freight transportation services where the rates are set by private contracts or through other means exempt from rate regulation under federal law.

17.     In the late 1970s, the freight industry – then closely regulated by the federal government – was experiencing serious economic trouble with rising operating costs, financial losses, and corporate bankruptcies. In response, Congress passed the Railroad Revitalization and Regulatory Reform act of 1976 and the Staggers Rail Act of 1980, which together largely deregulated the industry.

18.     As a result of this legislation, railroads and shippers could enter into private rail freight contracts. In contracts for rail freight transportation in markets where railroads faced effective competition or in contracts where rates were privately negotiated between the railroad and the shipper, the freight rates are unregulated by government agencies. Because shippers in some areas may not have competitive alternatives ("captive shippers"), Congress gave the Interstate Commerce Commission ("ICC") authority to establish a process under which captive shippers could obtain relief from unreasonably high rates. The ICC was later abolished by the Interstate Commerce Commission Termination Act of 1995, but its relevant rail freight regulatory functions were transferred to the Surface Transportation Board ("STB").

19.     The STB continues to regulate certain aspects of the freight railroad industry. Railroads, for example, have a common carrier obligation to provide rail service upon reasonable request. (49 U.S.C. § 11019a). They can provide that service under rates and terms agreed to in a confidential contract with the shipper (49 U.S.C. § 10709) or under openly available common carriage rates and service terms (49 U.S.C. 11101). Rates and

769843.1

5

CLASS ACTION COMPLAINT; DEMAND FOR JURY TRIAL

service terms established by contract are not subject to STB regulation, except for limited protections against discrimination involving agricultural goods (49 U.S.C. § 10709(b), (c)).

20.    The STB can adjudicate complaints challenging the reasonableness of a common carriage rate only if the carrier has dominance over the traffic involved. 49 U.S.C. §§ 10701(c)-(d), 10704, and 10707. Market dominance refers to "an absence of effective competition from other rail carriers or modes of transportation for the transportation to which a rate applies." 49 U.S.C. § 10707(a).

21.    The railroad freight industry became highly concentrated after Congress deregulated railroads. In 1976, there were 63 Class I railroads operating in the Untied States. By early 2000, the railroad industry had become so concentrated that further consolidation was unlikely, if not impossible. On March 17, 2000, the STB imposed a moratorium on any major railroad merger proposals.

22.    Currently, the five Railroad Defendants named in this action operate more than 90 percent of all domestic railroad tracks and are responsible for more than 90 percent of the total ton-miles of Class I rail freight shipped in the United States.

23.    As railroads contracted for freight transportation services, they increasingly required shippers to enter freight contracts with cost escalation provisions often tied to the "Rail Cost Adjustment Factor" ("RCAF"). The RCAF is published by Defendant AAR's Policy and Economics committee based in Washington, D.C., and includes fuel prices as a component of the cost escalation factor. In the fourth quarter of 2000, the AAR – which is controlled by the major Class I Railroads – published a RCAF without fuel as a component, which they called the "ALL-LF." The publication of the ALL-LF facilitated Defendants' ability to assess separate Rail Fuel Surcharges and to coordinate that practice.

## B.    Defendants' Price-Fixing of Rail Fuel Surcharges

24.    Plaintiff alleges that Defendants set Rail Fuel Surcharges as a percentage of the customers' base freight rate and agreed upon the use of common indices and trigger points for adjusting the percentages monthly. Defendants also published Rail Fuel Surcharges on

the Internet to facilitate coordination and the detection of any deviation from collusive pricing. Defendants maintained uniformity of Rail Fuel Surcharges throughout the Class Period by agreeing to compute the surcharges as a percentage of the rail freight transport base rate and by agreeing upon common indices, timing, and trigger points for adjusting the percentages.

25.     Although the purported purpose of a Rail Fuel Surcharge is to allow recovery by a railroad of an unanticipated fuel cost increase, Defendants, by working in concert, were able to use Rail Fuel Surcharges as revenue generators and profit centers.

26.     In or about April 2003, top executives of the five Railroad Defendants attended a National Freight Transportation Association ("NFTA") meeting at the Greenbrier Resort in West Virginia, which is owned by Defendant CSX. According to its internet site, the "object of the [NFTA] is to provide a forum for transportation executives of industrial firms and transportation companies to consider and discuss" various developments affecting the transportation industry. At that meeting, the Railroad Defendants had the opportunity to discuss and agree on the details of Rail Fuel Surcharges that were subsequently implemented in or before July 2003.

27.     The key element of Defendants' price-fixing conspiracy was an agreement by the Railroad Defendants to act in concert with one another in demanding the Rail Fuel Surcharges from shippers. The Railroad Defendants all agreed to apply Rail Fuel Surcharges computed as a percentage of the base rail freight rate.

28.     Such revenue-based fuel surcharge bore no direct relationship to actual increases in fuel costs. According to the STB, the Railroad Defendants have essentially conceded that the Surcharges are not a means of recovering increased fuel costs associated with the movement of freight, but are rather a "revenue enhancement measure" intended to achieve across-the-board increases in the prices charged by Defendants for rail freight transportation. *Rail Fuel Surcharges*, Surface Transportation Board, Decision, STB Ex Parte No. 661 at 7 (Jan. 25, 2007).

29.    The Railroad Defendants implemented and maintained their agreement by publicly announcing surcharge increases and posting the monthly fuel surcharge percentages on their internet sites. This allowed them to monitor and enforce Rail Fuel Surcharge levels.

30.    As a result of Defendants' collusive behavior, prices of rail freight transportation services charged to Class members were raised to or maintained at supracompetitive levels throughout the Class Period.

31.    As early as June of 2003, BNSF and UP agreed to coordinate their Rail Fuel Surcharge Prices. Prior to this time, the UP carload fuel surcharge was adjusted monthly based on the West Texas Intermediate ("WTI") Crude Oil Index while the BNSF carload fuel charge was based on the U.S. Department of Energy ("DOE") On-Highway Diesel Fuel Price Index ("HDF"). In or about June 2003, however, UP switched to the HDF Index pursuant to an agreement with the BNSF. From then on BNSF and UP moved in lockstep with each other both charging the same Rail Fuel Surcharge for each month of the Class Period.

32.    BNSF and UP agreed to administer the HDF index precisely the same way. Whenever the U.S. average price of diesel fuel, as measured by the HDF Index, equaled or was lower than $1.35 per gallon, no surcharge was applied. When the HDF index exceeded $1.35 per gallon, however, BNSF and UP both applied a surcharge of 0.5 percent for every 5 cent increase above $1.35 per gallon. So, for example, if the HDF Index rose 50 cents to $1.85 per gallon, BNSF and UP would apply a surcharge of 5 percent. The surcharge would increase/decrease 10 percent for every $1 dollar purchase increase/decrease in the HDF Index and corresponding increments thereof.

33.    BNSF and UP also coordinated when they could change their fuel surcharge. They agreed that the Surcharge would be announced the first day of the month following a change in the index and would become effective the month after that. So, for example, if the HDF Index average price changed in January, BNSF and UP would announce their new Rail Fuel Surcharge percentage on February 1, and then apply the surcharge to shipments in

March. BNSF and UP published their monthly fuel surcharge percentages on their websites, making any deviation from cartel pricing easily detectable.

34.    Using the HDF index, BNSF and UP moved in lockstep and charged virtually identical Rail Fuel Surcharges on a monthly basis through the Class Period.

35.    The Fuel Surcharge Percentages charged by BNSF and UP for carload shipments varied before the Class Period began, but were identical starting in July 2003.

36.    The choice to use the HDF Index for fuel surcharges was arbitrary. Also arbitrary were the decisions to set the trigger point at $1.35 per gallon, announce the surcharges on the first day of the month following a change in the Index, and to apply the surcharge in the second calendar month after the change in the Index. It is not plausible to suggest that such conduct stems from independent decision-making. Rather, the parallel conduct in conjunction with other factors evidences the existence of an agreement in violation of Section 1 of the Sherman Act. It defies reason to suggest that BNSF and UP, facing myriad differences in economic factors and business demands and requirements, would independently arrive at the same conclusions regarding: (1) the use of Rail Fuel Surcharges, (2) Use of the same fuel index, (3) calculating the Surcharges based on a percentage of the freight rate rather than actual fuel consumption, (4) use of the same trigger point for application of the Surcharges, (5) the dates on which Surcharges would be announced, (6) the dates on which Surcharges would become effective, and (7) the amount of the Surcharges.

37.    In short, the fact that BNSF and UP both chose and adhered to this same combination of features for their Rail Fuel Surcharge programs evidences that they coordinated their behavior. The similarities are both too precise and too comprehensive to have been arrived at independently.

38.    The Rail Fuel Surcharge percentages charged by the BNSF and UP for carload shipments varied before the Class Period began, but were identical starting in July 2003.

39.    In February 2004 or earlier, Defendants CSX and NS agreed to base their Rail Fuel Surcharge programs on the average monthly price of West Texas Intermediate ("WTI") Crude Oil as published in the *Wall Street Journal.* Indeed, not only did these railroads agree to use the WTI index (as opposed to many other available indices), they, too, agreed to administer the index in precisely the same way.

40.    Specifically, after an initial period in which their selected WTI trigger price differed, CSX and NS agreed to apply a Rail Fuel Surcharge whenever the monthly average WTI price exceed $23 per barrel. When that happened, Defendants' rates were increased 0.4 percent for every $1 that the price of WTI oil exceeded $23 per barrel. So, for example, if the price of WTI oil was $28 per barrel, the Rail Fuel Surcharge percentage would be 2 percent. The Surcharge would be adjusted upward/downward by 2 percent for every $5 increase/decrease in the WTI average price.

41.    CSX and NS also coordinated when they would change their Surcharge – two calendar moths after the WTI index had adjusted, thereby using the Rail Fuel Surcharge price timing used by BNSF and UP. For example, if the WTI average price exceeded $23 per barrel in January, the CSX and NS would assess the applicable Surcharge percentage to all bills of lading dated in the month of March. In this way, CSX and NS could apply the same Surcharge percentage month after month. CSX and NS published their monthly Surcharge percentages on their websites, making any deviation from cartel pricing easily detectable.

42.    The net result is that there was uniformity between CSX and NS in the monthly Surcharge percentages they charged customers for most of the Class Period.

43.    The Fuel Surcharge Percentages charged by CSX and NS for carload shipments varied before the Class Period, but were identical starting in February 2004.

44.    The choice to use the WTI index for Rail Fuel Surcharges was arbitrary. Also arbitrary was the decision to set trigger point at $23 per barrel and to apply the surcharge in the second calendar month after the averaged price of WTI oil had changed. Given Defendants' convergence on such arbitrary conclusions, Defendants' conduct cannot stem

from independent decisions. Rather, Defendants' conduct is evidence of an agreement in violation of § 1. It is nearly impossible that Defendants, facing myriad differences in economic factors and business demands and requirements, would independently arrive at the same conclusions regarding: (1) the use of Rail Fuel Surcharges, (2) use of the same fuel index, (3) calculating the Surcharges based on a percentage of the freight rate rather than actual fuel consumption, (4) Use of the same trigger point for application of the Surcharges, (5) the dates on which Surcharges would become effective, and (6) the amount of the Surcharges.

45.    In short, the fact that CSX and NS both chose and adhered to this same combination of features for their Rail Fuel Surcharge programs evidences that they coordinated their behavior. The similarities are too precise and too comprehensive to have been arrived at independently.

46.    The Rail Fuel Surcharge percentages charged by Defendants CSX and NS for carload shipments varied before the Class Period, but were identical starting in February 2004, and they also were identical to those of the KCSR starting in June 2005, when KCSR joined the conspiracy.

47.    The Railroad Defendants operate geographically dispersed, multibillion dollar corporations with thousands of locomotives, and other pieces of heavy railroad equipment, and have massive fuel requirements. The Railroad Defendants acquire fuel at different prices at different times to meet their various business requirements. The specific minutiae of Defendants' parallel behavior as described herein could not have resulted from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advanced understanding among the parties.

48.    The Railroad Defendants' use of the Rail Fuel Surcharges was not routine free market conduct. In a truly competitive market, the levying of surcharges by one or a few railroads based on a percentage of a customer's base rate – bearing no relation to the actual costs of fuel consumed – should create competition on surcharges by other railroads seeking

to gain business. Here, the Railroad Defendants did not compete and the only plausible explanation for that lack of competition is that the Railroad Defendants had entered into an unlawful agreement.

49. Since the beginning of the Class Period and before, Defendants fixed the price of the Rail Fuel Surcharges in order to fix the prices of rail freight transportation services. The surcharges were not a cost recovery mechanism, they were a revenue generating profit center. By computing the Rail Fuel Surcharge as a percentage of the base rate charged to the shipper, the Railroad Defendants ensured that there would be no real correlation between the rate increase and the increase in fuel costs for the particular shipment to which the surcharge was applied.

50. By using the price-fixed Rail Fuel Surcharges to set prices for rail freight transportation services, the Railroad Defendants realized billions of dollars in extra revenues during the Class Period from Plaintiff and members of the proposed Class.

C.   **The Surface Transportation Board's Ruling**

51. On January 25, 2007, the STB served an administrative decision concluding that the railroads' practice of computing Rail Fuel Surcharges as a percentage of base rates for regulated rail freight transport was "a misleading and ultimately unreasonable practice" because the fuel surcharges are not tied to the fuel consumption associated with the individual movements to which they are applied. The STB directed railroads to stop this unreasonable practice.

52. Although the STB's decision applied only to regulated freight, the Railroad Defendants followed the same unreasonable practices with regard to the unregulated freight that is the subject of this complaint.

53. The STB has also issued a Notice of Proposed Rulemaking in which it has proposed rules to monitor the freight railroads' monthly fuel costs, consumption, and revenue from Rail Fuel Surcharges. On August 8, 2007, the STB issued a decision requiring all Class

I railroads to segregate and separately report the total fuel-surcharge revenue collected to "monitor industry-wide fuel surcharge practices."

## ANTITRUST "PLUS FACTORS"

54.    Antitrust "plus factors" further support the allegation that Defendants agreed to fix prices for Rail Fuel Surcharges. The rail transportation industry is marked by certain structural and other characteristics that make a price fixing cartel feasible:

a.    The railroad industry is highly concentrated. The Railroad Defendants in this case are the five largest remaining domestic Class I railroads following decades of mergers and consolidation. The Railroad Defendants account for more than 90 percent of the nation's rail freight traffic. Such high concentration facilitates the possibility of a price fixing cartel.

b.    There are significant barriers to entry into the railroad industry. To compete, railroads must invest in a vast network of tracks, stations, yards, and switching facilities. Such an infrastructure takes decades to develop and requires onerous regulatory and environmental reviews and approval. Land or easements are often needed, necessitating the involvement of multiple local governments and the exercise of eminent domain power. Because rail infrastructure is on minimal value for other purposes, and rail networks are difficult to assemble, the fixed costs are largely sunk, creating significant entry barriers. Entry also requires that a new entrant capture a significant market share from existing carriers. Entry is thus both expensive and risky.

c.    The Rail Fuel Surcharges were highly standardized. The Railroad Defendants structures their Rail Fuel Surcharges as a percentage of base rates and then published the percentages on their websites so the colluding railroads could police the conspiracy without frequent communications. It is well recognized that markets having uniform and homogenous products or services are susceptible to price fixing.

d.    The railroad industry has a history of price fixing and other anti-competitive behavior.  In the first antitrust case dealing with the railroad industry, *United States v. Trans-Missouri Freight Ass'n*, 166 U.S. 290 (1897), the railroad cartel argued that it must fix prices or the industry would go bankrupt.  Prior to deregulation, railroads engaged in open price fixing through establishment of "rate bureaus" and "rate-making committees."  Although these bodies disappeared from public view after deregulation, the railroad industry has continued to engage in market manipulation, unreasonable rate practices, and other discriminatory practices against a wide spectrum of freight customers.

e.    The CEOs of the Railroad Defendants are all board members of the AAR, which facilitates transfer of pricing information.  The AAR describes itself as "the central coordinating and research agency of the North American rail industry."  Full membership, however, is available only to Class I railroads operating in the United States, five of which are Defendants in this action.  The AAR Board meets regularly and board members (and their staff) regularly communicate between meetings.  AAR meeting and events provide opportunity for the Railroad Defendants to discuss and agree upon a common course of action with respect to Rail Fuel Surcharges.

f.    Defendants acted in contravention of their individual economic interests.  The Railroad Defendants did not behave as if they were in a competitive market:

(i)    Defendants failed to compete on the Surcharges.  In a truly competitive market, rational railroads levying surcharges based on a percentage of a customer's freight rate – bearing no relation to the actual costs of fuel consumed and therefore not actually crucial to cost recovery – would compete on the basis of surcharges in order to lower a customer's overall bill and thereby gain business.  Shippers from many different industries, some with

significant economic power, tried to negotiate the fuel surcharge percentages, but were told by the Railroad Defendants that the Rail Fuel Surcharges were "not negotiable." Several national shipper organizations met with each of the Railroad Defendants to encourage them to reexamine the methods used to assess Rail Fuel Surcharges. Among the Defendants, only BNSF agreed to make responsible changes to its surcharge program, and that was only for grain and coal shipments coming from certain regions where the BNSF is the only carrier. The other Railroad Defendants refused to address the concerns of their customers.

(ii)    <u>Defendants' behavior alienated customers.</u> At or about the time the Railroad Defendants greed to fix the Rail Fuel Surcharge prices, they largely switched from offering long-term contracts to offering contracts that were "re-priced" in new negotiations semi-annually, quarterly or monthly. Previously, the Railroad Defendants had allowed, and often preferred, long term contracts ranging up to five years with clauses that did not permit rate increases beyond a certain point or that excluded fuel surcharges altogether. The Railroad defendants made this switch even though most shippers preferred the former system in order to minimize risk. In a competitive environment, forcing customers to assume greater risks without offsetting benefit (such as lower prices) would cause customers to seek alternatives, which should promote competition between carriers for their business. Here, all Railroad Defendants raised prices and did not offer any compensation to customers for assuming additional risk. This behavior gives rise to an interference of price fixing.

(iii)   <u>Defendants changed billing practices to expose each other's prices.</u> The Railroad Defendants sometimes stopped offering "through rates," in which a shipper would receive a single bill from either the originating

shipper or the termination railroad and a single fee would be allocated among the railroads that shipped. Instead, the Railroad Defendants moved to what is known in the industry as "Rule 11 pricing." Under Rule 11 pricing, where a shipment requires movement on more than one carrier, the two rates are stated separately rather than as one quote for the entire shipment. The Railroad Defendants made this change as part of their conspiracy for two reasons: to provide transparency as to what each railroad was charging on multiple line shipments and to allow each railroad to apply the agreed-upon Rail Fuel Surcharge in its own territory.

g.    During the Class Period, rail freight demand grew, but each Defendant's market share remained stable. Finally, demand for rail freight transportation services grew substantially during the period of the conspiracy, and yet the Railroad Defendants' market shares remained relatively stable and constant. The fact that market shares did not fluctuate significantly during a period of demand growth is further indication that the Railroad Defendants agreed to price fix rather than to compete for new sales.

## INTERSTATE TRADE AND COMMERCE

55.    During the Class Period, the Railroad Defendants transported more than 90% of all rail freight ton-miles within the United States. According to the STB, railway operating revenues for all Class I freight railroads was more than $52 billion in 2006.

56.    The activities of Defendants and their co-conspirators were within the flow of, and substantially affected, interstate and international commerce. During the Class Period, Defendants and their co-conspirators sold and carried out rail shipments in a continuous and uninterrupted flow of interstate and foreign commerce to shippers and customers throughout the United States. Each Defendant and their co-conspirators used instrumentalities of interstate or foreign commerce, or both, to sell and market rail freight transportation services.

57.     The unlawful activities of Defendants and the unnamed co-conspirators have had a direct, substantial, and reasonably foreseeable effect on interstate and international commerce.

## ANTITRUST INJURY

58.     The unlawful conduct, combination or conspiracy alleged herein had, and is having the following effects, among others:

        a.     The prices paid by Plaintiff and the Class for unregulated rail freight transportation services were fixed or stabilized at supracompetitive levels;

        b.     The Rail Fuel Surcharges charged to Plaintiff and the Class for unregulated rail freight transportation were fixed or stabilized at supracompetitive levels:

        c.     Plaintiff and the Class have been deprived of the benefits of free, open and unrestricted competition in the market for unregulated rail freight transportation; and,

        d.     Competition in establishing the prices paid in the United States for unregulated rail freight transportation has been unlawfully restrained, suppressed and eliminated.

59.     By reason of the violations of Section 1 of the Sherman Act and Section 4 of the Clayton Act, Plaintiff and the members of the Class have sustained injury to their business or property.  The injury sustained by Plaintiff and the Class is the payment of supracompetitive prices for unregulated rail freight transportation as a result of Defendants' illegal contract, combination, and conspiracy to restrain trade as alleged.  This is an antitrust injury of the type that the federal laws were meant to punish and prevent.

## V.     CLASS ACTION ALLEGATIONS

60.     Plaintiff brings this action on behalf of itself, and as a class action pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2) and 23(b)(3) on behalf of the following class:

> All purchasers of rail freight transportation services from Defendants, through use of private railroad-shipper contracts or through other means exempt from rate regulation under federal law, as to which Defendants assessed a Rail Fuel Surcharge, at any time from at least as early as July 2003 to the present (the "Class Period"). Excluded from the Class are Defendants, any subsidiaries or affiliates of Defendants, any Defendants' co-conspirators, whether or not named as a Defendant in this Complaint, and all governmental entities.

61.     Plaintiff does not know the exact size of the Class, since such information is in the exclusive control of the Defendants. Plaintiff believes that, due to the nature of the trade and commerce involved, the Class is so numerous and geographically dispersed throughout the United States as to render joinder of all Class members impracticable.

62.     Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff and all members of the Class directly purchased unregulated rail freight transportation from Defendants, on which Defendants imposed the artificially inflated Rail Fuel Surcharges. Plaintiff and Class members sustained damages by paying inflated prices for the unregulated rail freight transportation as a result of Defendants' illegal conduct.

63.     Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action and antitrust litigation.

64.     There are questions of law or fact common to the Class, including but not limited to the following:

        a.      whether Defendants engaged in a contract, combination or conspiracy among themselves to fix, maintain or stabilize the prices of fuel surcharges imposed on unregulated rail freight transportation services;

      b.     whether the conduct of Defendants caused the prices of unregulated rail freight transportation services to be artificially inflated to non-competitive levels; and

      c.     whether Plaintiff and other class members were injured by Defendants' conduct, and if so, the proper measure of damages.

65.     These and other questions of law are common to the Class, and predominate over any questions affecting only individual Class members.

66.     Plaintiff will fairly and adequately represent the interests of the Class in that Plaintiff is a typical purchaser of unregulated rail freight transportation services.

67.     A class action is superior to the alternatives, if any, for the fair and efficient adjudication of this controversy.

68.     Prosecution of separate actions by individual class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards or conduct for the Defendants.

## COUNT I

### (Violation of § of the Sherman Act and § 4 of the Clayton Act.)

69.     Plaintiff incorporates by reference the allegations in the above paragraphs as if they were fully set forth herein.

70.     Defendants entered into and engaged in a contract, combination or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act.

71.     The contract, combination or conspiracy resulted in an agreement, understanding or concerted action between and among Defendants in furtherance of which Defendants fixed, maintained, and standardized prices for Rail Fuel Surcharges for rail freight transportation handled through private contracts and other means exempt from regulation. Such contract, combination, or conspiracy constitutes a per se violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

72.     The contract, combination or conspiracy has had the following effects:

a.     Prices charged to Plaintiff and the Class for unregulated rail freight transportation services were fixed and/or maintained at supracompetitive levels;

b.     Prices charged to Plaintiff and the Class for Rail Fuel Surcharges applied to unregulated rail freight transportation were fixed and/or maintained at supracompetitive levels;

c.     Plaintiff and the Class have been deprived of the benefits of free, open and unrestricted competition in the market for rail freight transportation services; and

d.     Competition in establishing the prices paid, customers of, and territories for rail freight transportation services has been unlawfully restrained, suppressed and eliminated.

**WHEREFORE**, Plaintiff prays for relief as follows:

A.     That the Court determine that this action may be maintained as a class action under Rules 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure, that Plaintiff be denominated as class representative, and that Plaintiff's counsel be appointed as counsel for the Class;

B.     That the unlawful contract, combination and conspiracy alleged in Count I be adjudged and decreed to be unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act;

C.     That Plaintiff and the Class recover compensatory damages, as provided by law, determined to have been sustained as to each of them, and that judgment be entered against Defendants on behalf of Plaintiff and each and every member of the Class;

D.     That each of the Defendants' respective offices, directors, agents and employees, and all other persons acting on behalf of or in concert with them,

be permanently enjoined and restrained from, directly or indirectly, continuing or maintaining the combination, conspiracy, or agreement alleged in this case;

E.    That Plaintiff and the Class recover treble damages, as provided by law;

F.    That Plaintiff and the Class recover their costs of the suit, including attorney's fees, as provided by law; and

G.    For such further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial as to all issues triable by a jury.

Dated: August 24, 2007                  Respectfully submitted,

Barry Nace
DC Bar NO: 130724

PAULSON & NACE
1615 New Hampshire Avenue, NW
Washington, DC 20009-2520
Telephone: (202) 463-1999
Facsimile: (202) 223-6824

Bruce L. Simon
Esther L. Klisura
PEARSON, SIMON, SOTER,
WARSHAW & PENNY, LLP
44 Montgomery Street, Suite 1200
San Francisco, CA 94104
Telephone: (415) 433-9000
Facsimile: (415) 433-9008

Clifford H. Pearson
Gary S. Soter
Daniel L. Warshaw
PEARSON, SIMON, SOTER,
WARSHAW & PENNY, LLP
15165 Ventura Boulevard, Suite 400
Sherman Oaks, CA 91403
Telephone: (818) 788-8300
Facsimile:  (818) 788-8104

Thomas V. Girardi
GIRARDI KEESE
1126 Wilshire Boulevard
Los Angeles, CA 90017-1904
Telephone: (213) 977-0211
Facsimile:  (213) 481-1554

*Attorneys for Plaintiff and the
Proposed Class*

07 cv 1515 (PLF)
A

JS-44
(Rev.1/05 DC)

# CIVIL COVER SHEET

## I (a) PLAINTIFFS

Donnelly Commodities, Inc., on behalf of itself and others similarly situated.

## DEFENDANTS

Association of American Railroads; Union Pacific Railroad Co.; CSX Transportation, Inc.; Norfolk Southern Railway; Kansas City Southern Railway Co.

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF ___88888___
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Barry J. Nace
Paulson & Nace
1615 New Hampshire Ave., NW
Third Floor
Washington, DC 20009
(202) 463-1999

Case: 1:07-cv-01515
Assigned To : Friedman, Paul L.
Assign. Date : 8/24/2007
Description: Antitrust

JURY ACTION

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

○ 1 U.S. Government
   Plaintiff

◉ 3 Federal Question
   (U.S. Government Not a Party)

○ 2 U.S. Government
   Defendant

○ 4 Diversity
   (Indicate Citizenship of
   Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX
FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and **one** in a corresponding Nature of Suit)

◉ **A. Antitrust**

[X] 410 Antitrust

○ **B. Personal Injury/ Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

○ **C. Administrative Agency Review**

☐ 151 Medicare Act

**Social Security:**
☐ 861 HIA (1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)

**Other Statutes**
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

○ **D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

## E. General Civil (Other)    OR    ○ F. Pro Se General Civil

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| ○ **G. Habeas Corpus/ 2255** | ○ **H. Employment Discrimination** | ○ **I. FOIA/PRIVACY ACT** | ○ **J. Student Loan** |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General ☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation) *(If pro se, select this deck)* | ☐ 895 Freedom of Information Act ☐ 890 Other Statutory Actions (if Privacy Act) *(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| ○ **K. Labor/ERISA (non-employment)** | ○ **L. Other Civil Rights (non-employment)** | ○ **M. Contract** | ○ **N. Three-Judge Court** |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act ☐ 720 Labor/Mgmt. Relations ☐ 730 Labor/Mgmt. Reporting & Disclosure Act ☐ 740 Labor Railway Act ☐ 790 Other Labor Litigation ☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act) ☐ 443 Housing/Accommodations ☐ 444 Welfare ☐ 440 Other Civil Rights ☐ 445 American w/Disabilities-Employment ☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance ☐ 120 Marine ☐ 130 Miller Act ☐ 140 Negotiable Instrument ☐ 150 Recovery of Overpayment & Enforcement of Judgment ☐ 153 Recovery of Overpayment of Veteran's Benefits ☐ 160 Stockholder's Suits ☐ 190 Other Contracts ☐ 195 Contract Product Liability ☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

○ 1 Original Proceeding   ○ 2 Removed from State Court   ○ 3 Remanded from Appellate Court   ○ 4 Reinstated or Reopened   ○ 5 Transferred from another district (specify)   ○ 6 Multi district Litigation   ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

15 U.S.C. section 1; et seq. Plaintiff claims that Defendants engaged in a price fixing scheme to raise costs of freight railways in violation of antitrust laws

**VII. REQUESTED IN COMPLAINT**   ☒ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23   **DEMAND $** Excess of $5 Million   Check YES only if demanded in complaint   **JURY DEMAND:** YES ☒ NO ☐

**VIII. RELATED CASE(S) IF ANY**   (See instruction)   YES ☒ NO ☐   If yes, please complete related case form.

DATE 8-24-07        SIGNATURE OF ATTORNEY OF RECORD _____

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The **JS-44** civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.   CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.   CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.   CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.  RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.